*17 OPINION OF THE COURT
Meyer, J.
The Waterfront Commission Compact[1] contemplates the payment of commission expenses, to the extent not covered by Federal grant, by an assessment upon the industry computed upon gross payroll payments at a rate not in excess of 2%,[2] any amount over the total thus available to be financed by appropriations made by the New York and New Jersey Legislatures in proportion to the gross annual payments made to longshoremen for work in each State within the Port of New York district.[3] Payments made through trust funds established pursuant to Federal law covering vacation and holiday benefits and guaranteed annual income benefits are part of the gross payroll payments subject to assessment and the trust funds making such payments are “employers” within the meaning of the Compact’s assessment provision, as also are plaintiffs. The order of the Appellate Division should, therefore, be reversed, with costs, and the matter remitted for the entry of judgment as hereafter indicated.
I
This declaratory judgment action was begun by 4 steamship companies and 26 other companies, all of whom operate in the Port of New York area, against the Waterfront Commission of New York Harbor.[4] The four carriers do their own stevedoring and thus hire longshoremen directly. The other 26 companies provide stevedoring and related services for other carriers and in doing so directly employ longshoremen, who are represented in collective bargaining by the International Longshoremen’s Association (ILA). All 30 plaintiffs are members of the New York *18 Shipping Association (NYSA) although they do not sue in that capacity. In two causes of action, the complaint seeks judgment declaring (1) that assessment by the commission on the vacation and holiday benefits and guaranteed annual income (GAI) benefits hereafter described is unauthorized and unconstitutional and (2) that the formula by which the commission proposes to allocate to the respective plaintiffs a portion of the obligation for benefit payments previously made by the NYSA-ILA Vacation and Holiday Fund and the NYSA-ILA GAI Fund (Funds) hereafter referred to is arbitrary and invalid. The commission not only answered the complaint but also in a counterclaim against plaintiffs, the Funds and their trustees and NYSA asked judgment that the benefit payments are “gross payroll payments” within the meaning of section 9858 and that the plaintiffs are employers within the meaning of that section, or alternatively that the Funds are each, or that NYSA is, an employer within the meaning of the section. The reply of plaintiffs and of NYSA as a counterclaim-defendant in turn counterclaimed against the commission for the same relief asked by plaintiffs in their first cause of action as well as for the refund to NYSA of $3,334,528.14 in assessments alleged to have been paid by NYSA to the commission on such benefits during the period January 1, 1973 through February 24, 1978, which it was alleged was paid by it in error and was illegally collected by the commission. The reply of the other counterclaim-defendants admitted the formal allegations of the commission’s counterclaim but denied the commission’s right to assess on the basis of such benefit payments as well as any liability as an employer, and contained no refund counterclaim. Responding to the NYSA counterclaim, the commission alleged as affirmative defenses that the NYSA payments were voluntary and paid as a compromise, that payments from January 1, 1973 through March 21, 1975 were made by the Funds rather than NYSA, that administrative remedies had not been complied with and that NYSA had never protested payments made by it on the grounds alleged in its counterclaim.
The commission after appropriate discovery moved for summary judgment dismissing plaintiffs’ complaint and *19 the NYSA counterclaim and asking for judgment on its own counterclaim. Plaintiffs and NYSA cross-moved for summary judgment in favor of plaintiffs on their first cause of action and in favor of NYSA declaring the assessments illegal and enjoining their collection, dismissing the commission counterclaim and awarding NYSA a money judgment refunding the amounts paid to the commission. The Funds and their trustees also cross-moved for summary judgment dismissing the commission’s counterclaim on the ground, among others, that they are not “employers” within the meaning of section 9858. Special Term denied the commission’s motion and granted declaratory judgment to plaintiffs and counterclaim-defendants on their cross motions and summary judgment to NYSA for all amounts paid within six years prior to service of its counterclaim, with interest, a total of $4,063,145.10. The Appellate Division affirmed, without opinion, but granted leave to appeal to our court.
NYSA is a membership corporation, the members of which consist of steamship operators, stevedores, terminal operators and other firms performing related services for the shipping industry. NYSA acts as a multiemployer bargaining association, negotiating for its members with labor organizations, including the International Longshoremen’s Association, and administering collective bargaining agreements.
At the inception of the commission in 1953, longshoremen were receiving vacation and holiday payments in addition to wages. Payment of the commission’s assessment, computed on both wages and vacation and holiday pay was until December 31, 1972 made through NYSA’s Central Records Bureau, and was made “under protest to avoid penalties under the Act because the assessment is in conflict with the United States Constitution.”[5] Funds for the payment were obtained by NYSA assessment against its members, which until October 1, 1969 was made on a manhour basis, and thereafter on a combined manhour/ tonnage formula, the components of which have changed *20 from time to time until at present the manhour component is but 3% of the total.[6] Guaranteed annual income payments began in April, 1966, and caused the establishment by NYSA of a GAI Benefits Fund. Payments to the commission on GAI benefits were likewise made through NY-SA’s Central Records Bureau and made under protest.
In 1971 there was created by collective bargaining agreement between NYSA and ILA the NYSA-ILA Fringe Benefit Escrow Fund, into which shipping and stevedoring companies pay NYSA-ILA assessments for a variety of benefits. At the same time but as separate funds the NYSA-ILA Vacation and Holiday Fund and the NYSAILA GAI Fund (both defendants on the commission’s counterclaim) were created. The needs of the two latter funds are met as required by payment from the Fringe Benefit Escrow Fund. From January 1,1973 until March 31,1975, the commission’s assessment on vacation and holiday benefits and on GAI benefits was paid by the particular fund, under like protest.
NYSA and ILA then advised the commission that the Vacation and Holiday Fund and GAI Fund were not subject to commission assessments, the commission countered by demanding information from the employer-members of NYSA (the plaintiffs in this proceeding) as to the payments made by each to NYSA for vacation, holiday and GAI benefits and the employer-members protested both the demand for information and the commission’s ensuing deficiency notices addressed to them individually on the ground that the commission was empowered to assess only “gross payroll payments of employers of registered and licensed employees.” At that juncture there was presented to the NYSA board “a proposed resolution which would settle, without litigation, the Waterfront Commission assessment issue.” That resolution, which was adopted, provided that NYSA pay the commission assessment on “amounts actually paid to registered and licensed employees for GAI, Vacation and Holiday benefits” out of sums *21 paid to NYSA by carrier and employer-members for tonnage/manhour contributions, but also provided that NYSA could discontinue such payments by giving the commission 30 days’ written notice, such notice being without prejudice to a commission assessment against employers directly. Payments were made by NYSA pursuant to that resolution for the remainder of 1975, and all of 1976 and 1977. Payments were discontinued, following notice to the commission, with the payment dated February 24,1978 for the final quarter of 1977.[7] Following an information demand by the commission preparatory to assessment against employer-members of NYSA and protest by NYSA on their behalf, a stipulation was entered into between the commission and plaintiffs pursuant to which, rather than proceed by way of deficiency assessment imposed by the commission, the instant declaratory judgment action was begun by the employer-member plaintiffs.
Plaintiffs concede that longshore employees may work for one employer one day and another employer the next and are, therefore, considered industry employees rather than employees of a particular employer. As a result, the direct employer pays his longshore employees the hourly wages due them but fringe benefits are paid through an industry pool, originally the Central Records Bureau, and since establishment of the counterclaim-defendant Funds, through them.
Eligibility for vacation and holiday benefits depends upon the work history of an employee during 10 out of the past 12 years, the hours worked during the preceding year and the hours credited to the employee from work hours, compensation hours, disability hours, GAI hours, and reporting hours on days when work was not available for the employee. To receive maximum vacation benefits an employee must have received credit for 700 hours in 10 of the 12 preceding years and at least 1,500 hours in the immediately preceding contract year. During the fiscal year ended September 30, 1976, vacation payments totaled over $19,000,000 and holiday benefits in excess of $9,500,000. *22 The Vacation and Holiday Fund is tax exempt but income taxes are withheld on, and Social Security as well as Federal and State unemployment taxes are paid on vacation and holiday benefits paid to individual employees, each of whom receives from the Fund a withholding form (W-2) showing the total received by him and the tax deductions made. Social Security and unemployment taxes are, with the consent of the taxing authorities; allocated among the direct employers on the basis of the hours worked by the employee for each employer. As to the Social Security and State unemployment taxes, the direct employer files a return, taking credit for amounts already paid by the Fund. As to Federal unemployment taxes, the Fund pays to the employer its allocated portion of the taxes due and the employer files the necessary return and pays the taxes.
GAI benefits are paid only to employees who are registered and eligible to work and who make themselves available for work but for whom no work is available. To be eligible for such payments an employee must have worked 700 or more hours in his “qualifying” year and received wages or GAI payments for 700 or more hours in the last contract year of the preceding collective bargaining agreement. He must also, unless he has been called to direct employment, “badge-in” daily at a commission employment center (or as to maintenance employees at the union hiring hall), thus signifying his availability for work, remain there until all available jobs have been filled and accept, in inverse order of seniority, any available work on pain of a GAI debit and, after three such debits, the loss of his right to any GAI payment for the next 12 months. He may not be otherwise employed on a GAI credit day between the hours of 8:00 a.m. and 5:00 p.m. The GAI Fund makes biweekly payments to eligible recipients. During the fiscal year ended September 30, 1976, 5,098 workers received GAI benefits, 556 of them receiving the maximum benefit of $16,640 for doing no work at all, and 2,000 of them receiving at least $10,000. Total GAI benefits paid in that year were in excess of $30,000,000.
Since 1971 income taxes have been withheld on GAI payments and each recipient receives a W-2 form and is *23 subject to income taxes on the amounts received. The Internal Revenue Service has, however, ruled that such payments are supplemental unemployment benefits and not subject to Social Security or Federal unemployment taxes. GAI payments do not disqualify an employee for State unemployment benefits, but such unemployment benefits are deducted from GAI benefits payable to the employee.
The collective bargaining agreement between NYSA and ILA includes GAI benefits in the base upon which vacation and holiday benefits as well as other fringe benefits of a longshoreman are calculated, and the dues checkoff authorization directs the longshoreman’s employer, NYSA and the Funds “to deduct from my wages and earnings, earned and guaranteed, received by me by reason of my employment under a collective bargaining agreement” dues owed to ILA.
The GAI benefits program came into being because of the development of containerized cargo which beginning in 1958 reduced work opportunities and thus displaced longshoremen. The tonnage assessment by the NYSA-ILA Fringe Benefit Escrow Fund has replaced the manhour assessment in great part, in order to put the responsibility upon carriers who benefited from automation in handling cargo, to protect nonautomated carriers from costs arising out of automation, and to protect longshoremen from the resulting job displacement. Manhour assessment continues only with respect to passenger vessels and a group of bulk commodities which account for some 3% of the total NYSA-ILA assessment.
Special Term concluding, as do we, that the papers presented no triable issue concerning the above facts held, without reaching the question whether vacation and holiday or GAI payments are “gross payroll payments” within the meaning of section 9858, that that section as a taxing statute must be construed most strongly against the government and in favor of the taxpayer and that the payments in question not being made by employers and not being paid for work or labor performed, were not covered by the section. As already noted, the Appellate Division affirmed, without opinion.
*24 We disagree, concluding that the Compact, of which section 9858 is a part, (a) imposes an assessment rather than a tax; (b) with the purpose of imposing upon the industry, by an assessment measured by labor costs, the cost of eliminating unsavory and illegal employment and labor practices; (c) covers vacation and holiday and GAI payments which, though paid for not performing labor, and paid through tax-exempt trusts, are part of the labor costs within the meaning of the words “gross payroll payments” used in the section; and (d) permits assessment against the plaintiffs as well as the trusts with respect to such payments.
II
Section 9858 provides, so far as pertinent to this decision, that: “After taking into account such funds as may be available to it from reserves, federal grants or otherwise, the balance of the commission’s budgeted expenses shall be assessed upon employers of persons registered or licensed under this compact. Each such employer shall pay to the commission an assessment computed upon the gross payroll payments made by such employer to longshoremen * * * for work or labor performed * * * at a rate, not in excess of two per cent computed by * * * [estimating] the gross payroll to be made by employers subject to assessment *** [at a rate] which will yield revenues sufficient to finance the commission’s budget for each year.” Section 9861 declares the assessment to be “in lieu of any other charge for the issuance of licenses to stevedores *** or for the registration of longshoremen or for the use of an employment information center.” The budget, which may include á reasonable amount for a reserve to “be used for the stabilization of annual assessments, the payment of operating deficits and for the repayment of advances made by the two states” (§9858), is subject to disapproval or reduction by either Governor. To the extent the estimated yield of the section 9858 assessment falls short of balancing the budget, the Legislatures of the two States are required by the Compact to appropriate the amount of the shortfall “in proportion to the gross annual wage payments made to longshoremen for work in each state” (§ 9859).
*25 Threshold questions concerning the interpretation of these provisions relate to whether the contention that the section imposes not a tax but an assessment may be made to us not having been advanced below, and what law governs. Were the former argument a new one, it would nonetheless be proper for us to consider it because it is not a contention that could have been “obviated or cured by factual showings or legal countersteps” (Telaro v Telaro, 25 NY2d 433, 439), turning as it does on legislative intent. Moreover, the issue being legislative intent, the rule requiring strict construction of tax statutes yields to the explicit declaration of that intent in the statute itself (Williamsburgh Power Plant Corp. v City of New York, 255 App Div 214, affd 280 NY 551; see, also, Matter of Consolidated Edison Co. of N. Y. v City of New York, 44 NY2d 536, 541). Here the Compact in section 9872 directs that: “In accordance with the ordinary rules for construction of interstate compacts this compact shall be liberally construed to eliminate the evils described therein and to effectuate the purposes thereof.” That language refers to the entire Compact, from which section 9858 and related sections, whether they impose an assessment or a tax, may not be excluded simply because they deal with the raising of funds necessary to effectuate the Compact’s purposes.
Somewhat more complex is the determination of what law governs, the complicating factor being that the legislation to be construed is the product of not- one but three legislative bodies. Our determination in Matter of Bell v Waterfront Comm. of N. Y. Harbor (20 NY2d 54, 61) that construction of an interstate compact (indeed, the very compact now under consideration) is “a matter of Federal rather than State law” accords with the Supreme Court’s recent holding in Cuyler v Adams (449 US 433, 438, 442) that interpretation of a compact the subject matter of which is appropriate as a subject of Congressional legislation (as of course is waterfront governance, closely related as it is to interstate and foreign commerce) presents a question of Federal law. Thus, while uniformity of interpretation by the courts of New York and New Jersey is to be desired (cf. Murphy v Waterfront Comm., 39 NJ 436, affd in part 378 US 52), it is a uniformity born not of comity but *26 of the fact that each, in interpreting the Compact, is expounding Federal not State law. Thus, also, while State legislative history has bearing and is not to be ignored, the history of the Compact before the Congress is an essential of interpretation (cf. De Veau v Braisted, 363 US 144, 149-151).
The nature of the exaction authorized by section 9858 cannot be doubted after review of its legislative history. As part of the approval process a hearing on the Compact was held before a subcommittee of the House Judiciary Committee of which our erstwhile colleague, Kenneth Keating, then a Congressman, was chairman. Appearing before that subcommittee, Congressman Emanuel Celler raised a number of questions concerning the legality and constitutionality of various provisions of the Compact (Hearing before Subcommittee No. 3 of the Committee on Judiciary, House of Representatives, 83d Cong, 1st Sess, on HR 6286, HR 6321, HR 6343 and S 2383, p 50 ff). One such was whether “by levying assessments and other charges on shipowners [sic] and the shipping industry * * * the proposed agency * * * [was not] accomplishing by indirection that which the Constitution directly forbids” (id., p 53).[8] The answer, provided by Austin J. Tobin, Executive Director of the Port of New York Authority (itself a “compact” agency charged with recommending measures for the better conduct of commerce in the port and one of the agencies authoring the Waterfront Commission Compact [id., pp 77, 79]), was “that the provision in this bill is very distinctly not a tonnage tax but the assessment of a fee for the cost of administration and it is expressly provided in the compact as levied in lieu of a license fee” (id., p 84; emphasis supplied).
The distinction between a license fee and a tax is, of course, one long understood in our law. A license fee has for its primary purpose the regulation or restriction of a business deemed in need of public control, the cost of such *27 regulation being imposed upon the business benefited or controlled, whereas the primary purpose of a tax is to raise money for support of the government generally (Head Money Cases, 112 US 580, 595-596; People ex rel. Einsfeld v Murray, 149 NY 367, 376-377; see Cox v New Hampshire, 312 US 569, 577; Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d 158, 162; Paramount Film Distr. Corp. v State of New York, 30 NY2d 415, 421-422; People v Brooklyn Garden Apts., 283 NY 373, 381-382; 53 CJS, Licenses, § 3, p 451). The benefits to the industry — elimination of the evils in employment and employment practices and the adverse effect of those practices on the commerce of the port — are made clear both by the Compact’s legislative findings[9] and by its legislative history.[10] Those findings and that history are persuasive evidence of a legislative intent to correct the evils referred to by a program the cost of which was to be related to gross payroll payments because the new waterfront program would in major part redound to the benefit of employers.
In view of the purpose, scope and background of the Compact and of the supplemental legislation enacted by New York (§§ 9901-9937) and New Jersey (NJ Stats Ann, § 32:23-74 ff) pursuant to explicit Congressional authorization to amend and supplement the Compact (§ 9870; see De Veau v Braisted, 363 US 144, 153-154, supra), and the *28 relationship between the use to which the assessment was to be put and the base against which it was to be made, there can be little question that the legislative intent was to encompass in the words “gross payroll payments” the labor costs of the industry, however incurred.[11]
But, say plaintiffs and counterclaim-defendants, so to hold ignores the fact that for purposes of other laws the payments in question are not treated as wages, the use in section 9858 of the words “for work or labor performed”, and the pre-emptive effect of Federal tax and pension laws. As concerns the interpretation of other laws the short answer is that each is to be construed in relation to its own background and legislative history and that, therefore, such constructions (not all of which disagree with the conclusion we now reach) are not entitled to great weight in the construction of the Compact (cf. Central Ill. Public Serv. Co. v United States, 435 US 21, 29).
No more determinative is the fact that GAI and vacation and holiday benefits are paid for periods during which the recipient has not physically performed as a longshoreman. As the Supreme Court has recognized, vacation and holiday benefits are “a form of short-term compensation for work performed” (Foster v Dravo Corp., 420 US 92, 100). Furthermore, such payments were being made when the commission was established and eligibility to receive such benefits turns on work or labor as a longshoreman having been performed in the past. That the work and the payment do not coincide does not put such payments beyond the reach of section 9858.
GAT benefits are likewise within the coverage of the statute. Not only does eligibility turn on previous work as a longshoreman, but also the conditions with which a recipient must conform on a particular day to receive benefits for that day make it difficult to conclude that, though not engaged in handling cargo, he has not worked or performed labor. Thus, he is required to appear at a particular time and place, not to engage in work for others during usual working hours, and to accept stevedoring *29 work when available on pain of losing the right to payment for days on which work is not available (see Armour & Co. v Wantock, 323 US 126, 133; Kore v Celebrezze, 342 F2d 638). Moreover, the Legislatures of New York and New Jersey, by enacting provisions supplementary to the Compact in 1966, have agreed that GAI benefits may be regarded as paid for work. Thus, section 9907, which governs when a longshoreman can be removed from the commission’s register, directs that “the commission shall count as actual work the compensation received by any longshoreman pursuant to the guaranteed wage provisions of any collective bargaining agreement relating to longshoremen”, and paragraphs (a) and (f) of subdivision 2 of section 9920 require the commission, in deciding when to accept and when to suspend acceptance of applications for the register, to encourage regularization of employment and consider the effects of technological change and automation.[12] Having thus acknowledged the necessity for regularization of employment in light of containerization and directed that GAI payments be counted as work, the Legislatures of the two States may be deemed to have considered those payments “gross payroll payments” made for “work or labor performed” within the meaning of section 9858.
The pre-emption argument is that Federal law supersedes State regulation of either the collective bargaining process or the terms of labor agreements and that provisions of the Internal Revenue Code shield from taxation fringe benefit programs which result from collective bargaining. The issue before us, however, concerns neither Federal tax exemption nor regulation of collective bargaining, but whether the payments made from the Funds are subject to commission assessment under the provision of a bi-State compact approved by Congress.
Plaintiffs and NYSA suggest that the Compact must be regarded as a State law for pre-emption purposes notwithstanding Congressional approval. Not only did we hold to *30 the contrary with respect to the same Compact here in issue (Matter of Bell v Waterfront Comm. of N. Y. Harbor, 20 NY2d 54, 63, n 4, supra), but the Supreme Court in De Veau v Braisted (363 US 144, 153, supra) acknowledged with respect to the same Compact that as to a provision of the Compact itself (which § 9858 is) “even the most subtle casuistry could not conjure up a claim of pre-emption.” Because such a provision is, by reason of its Congressional approval, a Federal law, the question is not one of preemption, but at most of implied repeal by a later enacted Federal statute (De Veau v Braisted, 363 US 144, supra; Matter of Bell v Waterfront Comm. of N. Y. Harbor, 20 NY2d 54, supra; International Longshoremen’s Assn. v Waterfront Comm. of N. Y. Harbor, 642 F2d 666, 670, 672, supra; New York Shipping Assn. v Waterfront Comm. of N. Y. Harbor [DNJ Civ No. 78-995, pp 11, 12], affd 582 F2d 1275, cert den 439 US 1071). Nothing is advanced to support the conception of implied repeal[13] in the instant case, however.
We conclude that payments from both Funds are within the commission’s power of assessment under the Compact.
Ill
There remains the question whether the plaintiffs, or NYSA, or the Funds, or all three are liable for payment of the assessment. Plaintiffs, NYSA and the Funds each argue that it or they cannot be; the commission asks judgment that plaintiffs are, or in the alternative that the Funds are, or in the further alternative that NYSA is. We conclude that plaintiffs and the Funds are, and that NYSA if it undertakes to act on behalf of plaintiffs or the Funds with respect to the assessment may make itself responsible for its payment, but otherwise is not.
The section speaks of assessment “upon employers of persons registered or licensed under this compact.” Recipients of vacation and holiday pay and of GAI benefits are all licensed or registered, all have at some time in the past *31 been employed by one of the plaintiffs and all, except for those GAI recipients with sufficient seniority that they perform no longshoring work during the year, are at some time during the year employed in such work by one of the plaintiffs.
More importantly, however, as is recognized throughout the papers of both sides in this matter and was recognized during the hearings on the Compact referred to above (e.g., p 24), in the longshoring industry workers change employers from day to day, and as a result multiemployer bargaining is a vital factor (cf. Labor Bd. v Truck Drivers Union, 353 US 87, 94, 95). As a further consequence vacation and holiday benefits, which were being paid when the commission was established, though then paid upon the basis of the hours worked by an employee for his numerous employers, were being paid by the employers through NYSA’s Central Records Bureau. The container revolution in materials handling produced both the need for guaranteed annual income payments to employees and the possibility of obtaining funds for the greater part of such payments from the carriers in the form of tonnage assessments, to which the carriers were willing to agree in order to obtain the cost-reduction and time-saving benefits of containerization and still maintain labor peace. Approval of such assessments by the Federal Maritime Commission and changes in tax and pension laws have resulted in the greater part of the payments formerly made by employers themselves through the Central Records Bureau being made at present from tonnage assessments against carriers into the NYSA-ILA Escrow Fund, which then transfers to the Vacation and Holiday Fund or the GAI Fund whatever moneys are needed to meet the payments required of it. The employers have acted jointly with the collective bargaining representatives of the employees to obtain the carriers as a source of money and the Funds (with their tax benefits) as a vehicle for payment. That, however, does not diminish the relationship of the employers to the “gross payroll payments” for “work or labor performed”, which such benefits are, to such an extent as to insulate the employers from the commission’s assessment power.
*32 The commission, established to wipe out pre-existing evil and chaotic labor conditions, was intended to be funded primarily by assessment based upon the industry’s labor costs, not by the taxpayers of the States which, with the consent of Congress, created the agency. To hold otherwise than we now do would permit the employers acting together with the unions to cut off completely the commission’s assessment base by simply changing the vehicle through which they pay labor costs.
It follows that the plaintiffs, as employers, are assessable for vacation and holiday benefits and GAI benefits paid.[14] So also are the Funds, notwithstanding their trust provisions stating that they act as agent of no one and are not responsible for the debts or liabilities of NYSA or the employers, for as the payor of the benefits they may properly be regarded as the employer as to those benefits within the meaning of the assessment provision (cf. Bunnell v New England Teamsters & Trucking Ind. Pension Fund, 655 F2d 451, affg 486 F Supp 714).[15] NYSA, on the other hand, neither employs the individuals nor makes payment of the benefits. It would have no responsibility for the assessment, therefore, except as it undertook to act for the employers or the Funds in relation to the assessment.
The commission is, on the record before us, therefore entitled to judgment on its counterclaim declaring that as to vacation and holiday payments made by NYSA-ILA Vacation and Holiday Fund, the Fund as well as the plaintiffs are liable for the commission assessment on such payments and that as to GAI benefits paid by NYSA-ILA GAI Fund, that Fund as well as the plaintiffs are liable for the commission assessment on such payments.
*33 IV
The conclusions thus reached require dismissal of NY-SA’s refund counterclaim. Recovery of payments made by the Funds for periods prior to March 31, 1975 would be foreclosed in any event since the Funds themselves filed no counterclaim and NYSA’s counterclaim alleges no facts from which NYSA’s right to recover on behalf of the Funds can be inferred. But even if the Funds had counterclaimed, they would not be entitled to recover, since they paid assessments for which they as well as the plaintiffs were responsible. Their recourse, if any, would, therefore, be against plaintiffs.
With -respect to the post-March 31, 1975 payments NYSA would, as above noted, have no responsibility except as it undertook to act on behalf of the employers or the Funds in making the payments. At the time the NYSA payments began, however, the commission acknowledged that previous payments through NYSA had been made as a matter of procedural convenience and that it did not collect money from the NYSA-ILA Contract Board. The August 6, 1975 resolution of NYSA pursuant to which the payments sought to be recovered were thereafter made, and which stated that it was adopted to “settle, without litigation, the Waterfront Commission assessment issue,” could, therefore, have been adopted and the payments made only on behalf of the employers or the Funds or both. Because either the plaintiffs or the Funds could properly have been held for the assessments paid by NYSA and NYSA necessarily acted on the behalf of one or both, NYSA is entitled to no refund from the commission and must obtain any reimbursement, not already obtained by it, from plaintiffs or. the Funds. It is, therefore, unnecessary to consider the commission’s defenses to the NYSA counterclaim.
V
For the foregoing reasons the order of the Appellate Division should be reversed, with costs, the commission’s motion for summary judgment granted, plaintiffs’ and counterclaim-defendants’ cross motions for summary judgment denied, and judgment granted in favor, of the Water *34 front Commission (1) dismissing the first cause of action of plaintiffs’ complaint, (2) dismissing NYSA’s counterclaim, (3) on the commission’s counterclaim declaring that payments made by the Funds are subject to assessment pursuant to section 9858 and that plaintiffs as well as the Funds are employers liable for the payment of such assessment but that NYSA is not such an employer, and (4) severing the plaintiffs’ second cause of action for such further proceedings as they may be advised to seek.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order reversed, with costs, the Waterfront Commission’s motion for summary judgment granted, plaintiffs’ and counterclaim-defendants’ cross motions for summary judgment denied, and judgment granted in favor of the Waterfront Commission in accordance with the opinion herein.

. The commission was established in 1953 by interstate Compact (L 1953, ch 882; [NJ] L 1953, ch 202) which was approved by the Congress (67 US Stat 541). The Compact constitutes part I of title 29 of McKinney’s Unconsolidated Laws (Book 65). Parts II and III of that title enact implementing provisions not part of the Compact approved by Congress. The three parts, together are known as the Waterfront Commission Act. For facility of reference, provisions of the Compact (part I) and the implementing statutes (parts II and HI) will be cited by Unconsolidated Law section numbers.

. (§§ 9858, 9904.)

. (§ 9859.)

. The name was changed by chapter 951 of the Laws of 1970 to the Waterfront and Airport Commission of New York and New Jersey (§ 10060). The change has never become effective, Congressional consent to the additional Compact provisions never having been granted.

. The constitutionality of the act, sustained many times by Federal, New York and New Jersey courts (the decisional history is set forth in International Longshoremen’s Assn. v Waterfront Comm. of N. Y. Harbor, 642 F2d 666, 668-669), is not in issue in this proceeding.

. The history of the assessments is reviewed in proceedings relating to approval of the tonnage component by the Federal Maritime Commission as required by section 15 of the Shipping Act (US Code, tit 46, § 814), Transamerican Trailer Transp. v Federal Mar. Comm. (492 F2d 617), and New York Shipping Assn. v Federal Mar. Comm. (495 F2d 1215; see, also, Volkswagenwerk v Federal Mar. Comm., 390 US 261).

. The counterclaim and the commission’s reply agree that this is the fact, but the stipulation as to interest, dated March 12, 1980, shows a payment dated February 28, 1978 in the amount of $56,972.08 and a payment dated April 4, 1978 in the amount of $32,907.18.

. The reference was to article I (§ 10, cl 3) of the Constitution providing that: “No State shall, without the Consent of Congress, lay any Duty of Tonnage * * * enter into any Agreement or Compact with another State”. The issue sought to be raised is difficult to understand in view of the fact, later pointed out in Director Tobin’s response, that enactment of the bills under consideration would provide the required Congressional consent.

. The evils referred to are set forth at length in sections 9802-9805, but are sufficiently suggested by the findings in section 9802 that “waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment and a loss of respect for the law *** [which result in] destruction of the dignity of an important segment of American labor *** [and] direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the port of New York”. The evidentiary basis for these legislative findings is set forth at length in the Congressional hearings, above referred to, in the Fourth Report of the New York State Crime Commission (NY Legis Doc [1953], No. 70), the Report of the New Jersey Law Enforcement Council (1953), and in De Veau v Braisted (363 US, supra, at pp 147-151).

. Thus, the Summary of the Act to Establish the Waterfront Commission that had been presented to New Jersey’s legislators prior to that State’s adoption of the Compact was made part of the Congressional Hearings during the testimony of Governor Driscoll of New Jersey (Hearings, supra, at p 22). That document after reviewing the provisions concerning expenses of administration stated (id., at p 47): “It is felt that the savings to employers and consignees which may be obtained through a reduction in pilferage, the elimination of ‘phantom’ employees from the payroll, and other exactions and levies on commerce will greatly exceed the cost of administration of the waterfront commission program.”

. Thus, appropriations by the two States of any budget shortfall is, as above noted, required to be “in proportion to gross annual wage payments made to longshoremen for work in each State.”

. Not without some significance in this respect is the checkoff authorization quoted in the text above, which refers to' wages “earned or guaranteed.” Though not an agreement with plaintiffs or counterclaim-defendants as to the nature of the payments and addressed, as to GAI payments, to the GAI Fund, it nevertheless indicates the view of the labor forces of the industry that GAI payments fall within the wage or payroll concept.

. The April 13, 1978 letter of the District Director of Internal Revenue which suggested that the exempt status of the Funds could be jeopardized by payment of assessments by the Funds was, as the June 13, 1979 letter from the same office shows, “not concerned with the validity of the Waterfront Commission assessment” and in any event contains nothing to indicate that in reaching the conclusion that there might be jeopardy the director considered the effect of Congressional approval of the Compact.

. The allocation of the assessments against individual employers is not now before us, the cross motion of plaintiffs and NYSA having been directed only to their first cause of action and the counterclaim and not to the second cause of action.

. The suggestion that payment to the Funds by the escrow fund of enough to pay both benefits and assessment on benefits may create a Federal tax problem for the Funds hardly seems real in light of the solution to the problem referred to in the district director’s June 13,1979 letter, but in any event would not be determinative of the issues before us. We note, however, that our holding is not that the Funds must pay the assessment, but rather that if the employers do not the commission may proceed against either the employers or the Funds to recover the assessment due, though of course it could recover but once.