DELTA STEAMSHIP LINES,
INC., Plaintiff,

v.

NEW YORK SHIPPING ASSOCIATION,
INTERNATIONAL LONGSHORE-
MEN'S ASSOCIATION PENSION
TRUST FUND, and the Board of Trust-
ees of the New York Shipping Associa-
tion–International Longshoremen's As-
sociation Pension Trust Fund, Defend-
ants.

No. 85 CIV. 10007 (PKL).

United States District Court,
S.D. New York.

April 5, 1988.

Gibson, Dunn & Crutcher, New York
City (Stephen E. Tallent, Richard L. Dash-

efsky, Jonathan L. Sulds, Paul D. Inman, M. Chinta Gaston, of counsel), for plaintiff.

Lambos, Flynn, Nyland & Giardino (C.P. Lambos, Donato Caruso, of counsel), Thomas W. Gleason, Ernest L. Mathews, Jr., New York City, for defendants.

## OPINION AND ORDER

LEISURE, District Judge:

Plaintiff, Delta Steamship Lines, Inc. ("Delta"), has brought this action seeking a declaratory judgment that it is not an "employer" subject to pension withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381, et seq. Defendants New York Shipping Association–International Longshoremen's Association Pension Trust Fund and its trustees ("the pension plan") contend that Delta is an "employer" and counterclaim for the amount of Delta's withdrawal liability. The parties have cross-moved for summary judgment.

## BACKGROUND

From 1978 to 1983, Delta Steamship Lines was engaged in steamship carrier operations at the Port of New York. Delta did not operate its own marine terminal facility at the port; instead, Delta engaged a stevedoring company, which utilized longshoremen to service Delta's vessels.

Throughout its tenure at the Port, Delta was a member of the Carriers Container Council ("CCC"), a regional shipping association representing vessel carriers operating in ports from Maine to Texas. Delta was also a member of the local New York Shipping Association ("NYSA"). As a member of the CCC and the NYSA, Delta was a signatory to two collective bargaining agreements with the International Longshoremen's Association ("ILA"): first, a coastwide "master contract", and second, a local New York labor agreement, known as the General Cargo Agreement ("GCA").

*See* Affidavit of Richard O'Neill, Executive Vice President of the New York Shipping Association, Sworn to on March 18, 1986 ("O'Neill Aff."), Exhibit 2. These two agreements reflected the two-tier structure in longshore collective bargaining.

On the regional level, the ILA negotiated the master contract with a combined group composed of the NYSA, its counterpart employer associations in local ports from Maine to Texas, and the CCC. This master contract fixed the general terms of employment which applied uniformly in every ILA port in the eastern region of the United States. The carriers promised to employ only ILA–represented longshore labor to work their ships. The carriers also committed themselves to pay "job security program assessments" to offset shortfalls in contributions to longshore pension, welfare, and trust funds.

On the local level, the New York General Cargo Agreement covered local terms and conditions of employment, including guaranteed annual income, seniority, hiring practices, safety, vacation, holidays, pension and welfare benefits, and other matters of local concern. The New York General Cargo Agreement also required the steamship carriers to pay certain assessments, which provided funds for longshoremen fringe benefits and retirement programs. From 1974 to 1985, the assessments were based solely on tonnage.[1] The assessments were paid by the carriers to the NYSA, and the bulk of the assessment monies were then placed in the NYSA–ILA Fringe Benefits Escrow Fund. The portion of the assessment monies to be used for pension plan contributions, however, was paid directly by the NYSA to the pension plan. The total annual amount of contributions to be paid to the pension plan was fixed by the New York General Cargo Agreement at a guaranteed minimum level, which was actuarially determined to ensure that adequate funds to provide retirement benefits would accrue over an extended period of time.

---

1. Since July 1, 1985, the assessments have been based on both tonnage and the number of container units brought to and from the port by a carrier.

For the period during which Delta engaged in steamship operations in New York, Delta paid assessments based on the tonnage of cargo loaded and unloaded from its ships. After Delta discontinued its operations in New York in 1983, the pension plan attempted to obtain withdrawal liability payments from Delta pursuant to the provisions of the MPPAA.

Delta seeks summary judgment on its claim that it is not an "employer" subject to MPPAA withdrawal liability. Delta has also separately made a demand, pursuant to 29 U.S.C. § 1401, for arbitration to determine the amount of withdrawal liability in the event this Court finds Delta is an MPPAA "employer".[2]

## DISCUSSION

When Congress enacted ERISA in 1974, one of its principal purposes "was to ensure that employees and their beneficiaries would not be deprived of anticipated benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). Toward this end, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned government corporation under the auspices of the Department of Labor. The PBGC collects insurance premiums from covered pension plans, and provides benefits to participants in those plans which terminate with insufficient assets to support guaranteed benefits. *Id.*

In July 1978, the PBGC issued a congressionally mandated report which analyzed certain problems facing multiemployer pension plans.[3] The report concluded that ERISA, as originally enacted, was not adequately protecting multiemployer plans from the adverse consequences that result-

ed when individual employers terminated their participation in, or withdrew from, such plans. In order to "alleviate the problem of employer withdrawals, the PBGC suggested new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. at 723, 104 S.Ct. at 2715. Such withdrawal liability was included in proposed legislation formally sent by the Executive Branch to Congress in 1979.

Congress agreed with the analysis put forward in the PBGC report. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 217, 106 S.Ct. 1018, 1022, 89 L.Ed.2d 166 (1986). In 1980, Congress thus enacted, and the President signed, the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 et seq., which requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the plan. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. at 724–25, 104 S.Ct. at 2715. "This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Id.* at 725, 104 S.Ct. at 2715. *See also Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. at 213–217, 106 S.Ct. at 1020–22. Specifically, the MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined ... to be the withdrawal liability." 29 U.S.C. § 1381(a).

Although the MPPAA uses the term "employer" to refer to the party which contributes to the multiemployer pension

---

**2.** *29 U.S.C.* § 1401 provides, in relevant part, that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under [29 U.S.C. §§ 1381–1399] shall be resolved through arbitration." Section 1401 prescribes the procedure for initiating such an arbitration proceeding. Delta made its demand for arbitration prior to the initiation of this lawsuit. Delta's demand

was intended to preserve its statutory right to arbitrate pursuant to 29 U.S.C. § 1401. No arbitration proceeding has yet commenced.

**3.** Pension Benefit Guaranty Corporation, Multiemployer Study Required by P.L. 95-214 (1978).

plan, neither the MPPAA itself, nor its legislative history, provides any definition of that term. Title I of ERISA does define an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan," 29 U.S.C. § 1002(5). However, while this definition "may otherwise reflect the meaning of the terms defined as used in other Titles [of ERISA]," this definition does not necessarily apply to the MPPAA of its own force. *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 370 n. 14, 100 S.Ct. 1723, 1731 n. 14, 64 L.Ed.2d 354 (1980).

■ In the absence of an explicit definition in the MPPAA, the term "employer" must be defined in the context of the statute, and "must be read in the light of the mischief to be corrected and the end to be attained." *See NLRB v. Hearst Publications*, 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944). At the very least, the term "employer" must not be defined in a way which undermines the MPPAA's remedial objectives and purposes—namely, to alleviate the fiscal instability of multiemployer pension plans caused by withdrawals of plan contributors.

■ Delta suggests that the common law definition of "employer" should be applied to the MPPAA. Under common law, the existence of an employer-employee relationship depends upon a variety of factors, including the control and supervision of work, the payment of wages, and the right to hire and fire. *See, e.g., International Longshoremen's Association v. Delta Steamship Lines*, 832 F.2d 759, 763 (2d Cir.1987) (*citing Clinton's Ditch Cooperative v. NLRB*, 778 F.2d 132, 138–39 (2d Cir.1985)). *See also Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423, 429 (2d Cir.1974); *Mav Freight Service, Inc. v. United States*, 462 F.Supp. 503, 507 (E.D.N.Y.1978); *Pelow v. Sork Enterprises, Ltd.*, 39 A.D.2d 494, 496, 337 N.Y.S.2d 218, 220 (3d Dept.1972), *aff'd*, 33 N.Y.2d 944, 353 N.Y.S.2d 729, 309 N.E.2d 130 (1974). Delta claims that applying these factors, it cannot be considered an "em-

ployer" for purposes of withdrawal liability.

■ However, none of the above common law factors relate to Congress' remedial purpose in adopting the MPPAA. Were Congress to be deemed to have adopted a common law definition of "employer," then application of the MPPAA's withdrawal liability would be restricted to those pension plan contributors who control and supervise the work of the plan's beneficiaries, pay the wages of the beneficiaries, and have the right to hire and fire the beneficiaries. Nothing in the MPPAA or its legislative history indicates that Congress sought to impose such a restriction. While common law "employers" normally will make the necessary contributions to a multiemployer pension plan, it is contributions to the plan, rather than the terms of the employment relationship *per se*, which the MPPAA regulates. It would frustrate the congressional purpose behind the MPPAA to hold that contributors, which are not common law employers, can never be subject to withdrawal liability. As Judge Weinfeld explained:

> The risk Congress sought to address through the MPPAA was to preserve the fiscal soundness of a multiemployer plan from being impaired by the withdrawal of a contributor to that plan before the contributor had satisfied its portion of the plan's unfunded vested benefits. Clearly, through the imposition of liability in the event of withdrawal, Congress sought to remove the incentive for a contributor to withdraw prematurely from a plan, and, where such withdrawals took place, to mitigate the financial impact on the plan through the actual payment of withdrawal liability. To give the term "employer" a common law or dictionary definition ... would eliminate withdrawal liability for a large number of "contributors" and expose many multiemployer plans to the precise threat that Congress meant to address through the enactment of the MPPAA.

*Korea Shipping Corp. v. New York Shipping Association*, 663 F.Supp. 766, 769

**1564**

(S.D.N.Y.1987) (footnote omitted).[4]

The relationship between Delta and the ILA pension fund demonstrates the inappropriateness of a common law definition of "employer" for the MPPAA. As a whole, the employment relationships in the shipping industry cannot be defined by unduly rigid standards. Longshoremen provide services for several different entities —for carriers, for stevedores, and for shippers—and perhaps no one entity can properly be identified as the "employer," in the common law sense of the word, of particular longshoremen. These employment relationships are reflected in the type of tonnage assessment system in which Delta participated:

> The unique nature of the employment relationship in the maritime industry creates the need to provide a mechanism for the funding and disbursement of fringe benefits. In essence, the longshoreman is an employee of the entire port industry. His individual loading assignments often cause him to work for a number of employers in a relatively short span of time. Thus, the practice in the Port of New York and other ports is for the individual employer to pay the longshoreman's wages for the time that he works on that particular job, and for a common association, in this case NYSA, to pay the fringe benefits that accrue generally from employment in the industry rather than from employment in a particular assignment.

*Transamerican Trailer Transport, Inc. v. Federal Maritime Commission,* 492 F.2d 617, 621 n. 4 (D.C.Cir.1974). *See also New York Shipping Association v. Federal Maritime Commission,* 571 F.2d 1231, 1241 (D.C.Cir.1978); *American Sugar Refining Co. v. Waterfront Commission,* 55 N.Y.2d 11, 19–23, 447 N.Y.S.2d 685, 689–90, 432 N.E.2d 578, 581–83, *appeal dismissed,* 458 U.S. 1101, 102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982).

While the NYSA acted as the conduit, on behalf of its members, for payment of longshoremen fringe benefits, it was the members themselves which provided funding for those benefits.[5] The New York General Cargo Agreement specifically provided that:

> This agreement shall be executed by the ILA for and on behalf of itself and its affiliated Locals and by New York Shipping Association Inc. for and on behalf of its employer-members and by each contracting stevedore and vessel carrier who directly or indirectly utilizes the services of any employees covered by this agreement and who by such execution binds itself and its successors to each and every term and condition of the agreement, including, without limitation, the contribution of its proportionate share of the hourly, tonnage and other supplemental and fringe benefit contributions provided herein. If any carrier does not subscribe to this and the accompanying JSP Agreements, the ILA shall have the right not to work on the loading and discharging of its ships or any work ancillary thereto.

General Cargo Agreement, October 1, 1980 to September 30, 1983, at 74. O'Neill Affidavit, Exhibit 2. The General Cargo Agreement also provided that "[e]ach carrier (both private and governmental) shall be responsible for an assessment amount per ton on each ton of non-excepted cargo loaded or discharged in the Port of New York ...," and that:

> Such tonnage assessment shall be collected by the direct employer from each of the carriers and shall be paid to NYSA for immediate transmittal to the NYSA–ILA Fringe Benefits Escrow Fund (after deduction fo pension payments an [sic] NYSA administrative expenses) as collected by said direct employers. Pension payment shall be made by NYSA directly to the NYSA–ILA Pension Trust Fund.

---

**4.** In *Korea Shipping,* Judge Weinfeld determined that the Korea Shipping Corporation—a carrier using the New York port and having the same relationship to the ILA pension fund as Delta—was an MPPAA "employer" subject to withdrawal liability.

**5.** *Cf. International Longshoremen's Association (Consolidated Express, Inc.),* 221 N.L.R.B. 956, 974 (1975), *enforced,* 537 F.2d 706 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977).

Amounts billed to carriers and not collected by the direct employers shall be reported to the NYSA–ILA Fringe Benefits Escrow fund promptly at the end of each billing period.

*Id.*

■ Each carrier thus made contributions to the pension fund, which were correlated to the carrier's use of the longshoremen. Delta argues that it should not be subject to withdrawal liability because it was the NYSA that physically turned the monies over to the pension fund. But as Judge Weinfeld observed, "[t]o hold that it is the NYSA that is obligated to make contributions to the Pension Trust Fund but not its members would be to put form over substance and thereby create another convenient method for insulating persons contributing to a multiemployer plan from withdrawal liability." *Korea Shipping,* 663 F.Supp. at 771. Indeed, "[t]he mere existence of an intermediary used to collect and distribute the separate contributions of its members does not remove those members from the status of contributors to the plan." *Id.*

It would thus contradict Congress' purpose in enacting the MPPAA to hold that the MPPAA definition of "employer" does not include Delta: Delta was a party to a collective bargaining agreement which established the pension plan, Delta directly benefited from extensive utilization of the plan's beneficiaries, and Delta was required by that collective bargaining agreement to make payments to the pension plan in proportion to its use of the plan's beneficiaries.

In *Korea Shipping,* Judge Weinfeld concluded that "the term 'employer,' as used in [the MPPAA], is meant to include a person who is obligated to contribute to a plan either as a direct employer or in the interests of an employer of the plan's participants." *Korea Shipping,* 663 F.Supp. at 770. This definition of "employer" reflects Congress' intent to protect the financial integrity of multiemployer pension

plans. While a common law "employer" will normally make contributions to a plan on behalf of its employees, it is also true that a multiemployer labor agreement can provide that an entity, other than the common law employer, will make contributions to the plan. Such contributions can be made by an entity which directly employs the plan's beneficiaries. Or such contributions can be made on behalf of the direct employer, whose employees would presumably otherwise demand that the direct employer itself contribute to the plan.

In *Korea Shipping,* Judge Weinfeld determined that the Korea Shipping Corporation—a carrier using the New York port and having the same relationship to the ILA pension fund as Delta—was an MPPAA "employer" because "unquestionably it was, at the very least, acting indirectly in the interests of an employer in relation to the pension plan." *Korea Shipping,* 663 F.Supp. at 772. Judge Weinfeld observed that:

the agreements between the members of the NYSA and the ILA, to which KSC was a party, appear to have assumed that there was at least an indirect employment relationship between the carriers and the longshoremen, and those agreements were negotiated, and payments were to be made, on behalf of the carriers *and* the stevedores, who are the direct employers of the longshoremen. KSC's vessels could not have been loaded or unloaded in New York harbor without compliance with the agreement to which it was a party.

*Id.* (emphasis in original).

■ The longshoremen's collective bargaining agreement assigns to the NYSA members various roles, all of which are normally handled by the traditional common law employer. Under this scheme, the carriers, such as Delta, make contributions to fund the ILA pension plan in the same way a common law employer would fund a plan in a more traditionally structured industry.[6] Delta, like the Korea Shipping

**6.** Delta argues that unless the common law definition of "employer" is applied to the MPPAA, the MPPAA would contradict Section 302 of the

Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186. The LMRA provides that "[i]t shall be unlawful for any employer or associa-

Corporation, "obligated itself to pay assessments which it knew were intended and used to meet its responsibility, as a member of the NYSA and a subscriber to the General Cargo Agreement, to fund the pension plan." *Korea Shipping*, 663 F.Supp. at 772. This Court finds, as did Judge Weinfeld, that "[p]ermitting a person, who was contractually obligated to contribute to a plan in the direct interests of an employer (in this case the stevedores) to escape withdrawal liability would create such a significant exception to the [MPPAA's] statutory framework that the very effectiveness of the Act would be threatened." *Korea Shipping*, 663 F.Supp. at 769–70.[7]

## CONCLUSION

Defendants' motion for summary judgment is therefore granted to the extent

---

tion of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value" to an employee representative under certain specified circumstances. 29 U.S.C. § 186(a). But the LMRA exempts from this prohibition contributions "to a trust fund established by [a labor representative] for the sole and exclusive benefit of the employees of such employer [mentioned in § 186(a)]...." 29 U.S. C. § 186(c)(5).

Delta argues that the common law definition of employer applies to the LMRA, and that unless the same definition is applied to the MPPAA, "the same contributions rendered illegal under Section 302 [of the LMRA] would nevertheless provide the basis for withdrawal liability under MPPAA." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of its Cross–Motion for Summary Judgment, at 18.

However, nothing in the LMRA supports Delta's analysis. There is no question that the ILA pension trust has been established for the sole and exclusive benefit of the longshoremen. The LMRA provides that contributions can legally be made to that trust fund by "any employer or association of employers or any person ... who acts in the interest of an employer." 29 U.S.C. § 186(a). Thus, even if Delta is not the common law, or direct, employer of the longshoremen, it certainly is making contributions to the fund as a member of an association of employers, as well as in the interest of the longshoremen's direct employers.

Plaintiff's reliance on *Walsh v. Schlecht*, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977) is misplaced. In *Walsh*, a contractor was required, by the terms of a labor agreement, to make contributions to a carpenter's trust fund, in proportion to the number of hours of carpentry work performed by a subcontractor's employees. The Supreme Court ruled that such contributions did not violate § 302 of the LMRA because the trust fund benefits were payable only to employees of signatories to the labor agreement establishing the fund. The Supreme Court concluded that the contractor's contributions in *Walsh* did "no disservice to the congressional purpose in enacting § 302 to combat 'corruption of collective bargaining through bribery of employee representatives by employers, ...

extortion by employee representatives, and ... the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." *Id.* at 410–11 (footnote omitted).

In the present case, Delta was a signatory to the collective bargaining agreement which created the ILA pension trust fund; Delta benefitted from the use of the fund's beneficiaries; and the only fund beneficiaries were longshoremen employed by signatories to the collective bargaining agreement. An MPPAA definition of "employer", which holds Delta liable for withdrawal liability, is in no way inconsistent with the LMRA, or with Congress' purpose in enacting § 302.

**7.** Delta asserts that holding it liable for MPPAA withdrawal liability contradicts the Second Circuit's recent decision in *International Longshoremen's Association v. Delta Steamship Lines*, 832 F.2d 759 (2d Cir.1987). *I.L.A. v. Delta* concerned what obligations, if any, Delta had under a January 1984 longshoremen's collective bargaining agreement negotiated by the NYSA on behalf of its members. In that case, the Court of Appeals found that summary judgment on a motion to confirm an arbitration award was inappropriate, because genuine issues of fact were raised as to whether Delta was indeed a party to that 1984 agreement. The present case, however, concerns Delta's obligations pursuant to the 1980–83 longshoremen's collective bargaining agreement, and no similar issue of fact is raised with respect to that agreement.

Moreover, to the extent that the Court of Appeals considered Delta's status as an "employer" of longshoremen, it did not consider the meaning of the term "employer" in the MPPAA. Instead, the Court held that summary judgment could not be granted on the issue of whether Delta was a common law "employer" of the longshoremen. Delta had claimed that a NYSA–ILA Containerization Agreement was unlawful under Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), which makes illegal any agreement meant to affect the employment relations of non-union, third-party employers. In that separate context, the Second Circuit stated that the common law test of "supervision and control" determined whether Delta could be deemed an employer.

that 1) plaintiff Delta is determined to be an "employer" pursuant to the MPPAA; 2) Delta, pursuant to the MPPAA, is liable to the ILA pension plan for withdrawing from that plan; and 3) Delta's complaint is dismissed.

The parties are hereby directed to proceed with the arbitration, initiated by Delta pursuant to 29 U.S.C. § 1401, for the purpose of determining the amount of Delta's withdrawal liability.

Plaintiff Delta's cross-motion for summary judgment is accordingly denied.

Neither party shall be entitled to recover costs or attorneys fees.

SO ORDERED.