**WATERFRONT COMMISSION OF NEW YORK HARBOR, Plaintiff,**

v.

**CONSTRUCTION AND MARINE EQUIPMENT COMPANY, INC., Defendant.**

**Civ. No. 95–3067(WHW).**

United States District Court, D. New Jersey.

June 18, 1996.

Gerald P. Lally, David B. Greenfield, Waterfront Commission of New York Harbor, New York City, for Plaintiff Waterfront Commission of New York Harbor.

Ronald H. DeMaria, DeMaria, Ellis, Hunt & Friedman, Newark, New Jersey, for Defendant Construction and Marine Equipment Co., Inc.

## OPINION

WALLS, District Judge.

The Waterfront Commission of New York Harbor ("Commission") has applied for a

preliminary injunction restraining Construction and Marine Equipment Co., Inc. ("CME") from performing certain activities that allegedly violate the Waterfront Commission Act, N.J.S.A. § 32:23–1 *et seq.* (the "compact").[1] Pursuant to N.J.S.A. § 32:23–90, the Commission seeks to enjoin CME from performing services as a stevedore without being licensed, as required by N.J.S.A. § 32:23–19; employing persons to perform the services of longshoremen and checkers who are not included in the longshoremen's register, required by N.J.S.A. § 32:23–27 and –105; and employing persons as pier superintendents or hiring agents without those employees having first obtained a license, as required by N.J.S.A. § 32:23–12. The defendant, CME, offers several defenses.

For reasons discussed below, the Court grants the Commission's application for a preliminary injunction.

## I. *Background*

In June 1953, the legislatures of New Jersey and New York adopted identical statutes creating the Waterfront Commission, a bistate instrumentality. N.J.S.A. § 32:23–1 *et seq.*; N.Y. Unconsol. Laws § 9801 *et seq.* (McKinney). Plaintiff, the Commission, was formed to seek to eliminate racketeering and other criminal, corrupt and evil labor conditions on the waterfront of the Port of New York District. Reporting for work, large groups of longshoremen would appear at "shape ups." To get work, they would have to pay kickbacks, gamble with a particular person, or borrow at usurious rates from designated lenders. These practices not only "depress[ed] and degrad[ed]" waterfront labor, as Article I of the compact put it, but also were criminal or led to crime.

As required by Article I, § 10 of the United States Constitution, the compact was submitted to Congress for its consent. On August 12, 1953, consent was given. Pub.L. No. 83–252, 67 Stat. 541 (1953). This, though, was no mere approval. Congress not only consented to "all of [the compact's] terms and provisions," but also pre-approved "the carrying out and effectuation of said compact, and enactments in furtherance thereof." In addition, the compact states that

> [a]mendments and supplements to the compact to implement the purposes thereof may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other.

N.J.S.A. § 32:23–70.

Mainly, the supply of waterfront labor would be regulated by a longshoremen's register.[2] This register would include "all qualified longshoremen eligible." N.J.S.A. § 32:23–27. And after December 1, 1953, no person could work as a longshoreman within the Port of New York district unless his name was on the register, and no person could employ someone to work as a longshoreman in the district unless that worker was registered. The register was meant to ensure that the supply of waterfront labor did not outstrip demand, and thus remove the vulnerability of laborers to unscrupulous hiring practices.

A primary duty of the Commission is to maintain the longshoremen's register. This responsibility, as contained in N.J.S.A. §§ 32:23–24 and –38, allowed the Commission to control the labor supply by adding or removing names from the register. The Commission can eliminate individuals from the register who had not been working as longshoremen or looking for such work, and to include additional individuals "on a temporary basis to meet special or emergency needs." See N.J.S.A. §§ 32:23–34 & –38.

In the early 1960s, new technological developments transformed the cargo transportation industry. The traditional labor-intensive methods of unloading break-bulk vessels gave way to more efficient methods such as containerization. Ships now regularly carry

---

1. The New York Shipping Association sought leave to submit an amicus brief on the constitutional issues in this case. The Court denied leave because both parties had adequately briefed these issues, and the amicus brief would not be helpful to the Court's resolution of that matter.

2. The compact also provided that longshoremen (and port watchmen) be hired through "employment information centers." N.J.S.A. § 32:23–53. These centers were to be established and maintained by the Commission.

their goods in gigantic containers, which can be moved ashore by gigantic land-based cranes. Containerization has greatly reduced the need for longshoremen.

Recognizing this, in 1965, waterfront management and labor entered into a collective bargaining agreement that guaranteed an annual income to waterfront laborers, regardless of the availability of work.

In 1966, the New Jersey and New York legislatures passed legislation to amend the compact. This legislation, signed into law by the governors of the two states, included § 5–p, which places control over the opening and closing of the register in the Commission. In New Jersey, § 5–p was codified as N.J.S.A. § 32:23–114:

> [t]he commission shall suspend the acceptance of applications for inclusion in the longshoremen's register for a period of 60 days after the effective date of this act. Upon the termination of such 60 days period the commission shall thereafter have the power to make determinations to suspend the acceptance of applications for inclusion in the longshoremen's register for such periods of time as the commission may from time to time establish and, after any such period of suspension, the commission shall have the power to make determinations to accept applications, which shall be processed in the order in which they are filed with the commission, for such period of time as the commission may establish or in such number as the commission may determine, or both. Such determinations to suspend or accept applications shall be made by the commission on its own initiative or upon the joint recommendation in writing of stevedores and other employers of longshoremen in the Port of New York District. . . .

N.J.S.A. § 32:23–114.

The statute then goes on to note that

> [i]n administering the provisions of this section, the commission shall observe the following standards:
>
> (a) To encourage as far as practicable the regularization of the employment of longshoremen;
>
> (b) To bring the number of eligible longshoremen into balance with the demand for longshoremen's services within the Port of New York District without reducing the number of eligible longshoremen below that necessary to meet the requirements of longshoremen in the Port of New York District;
>
> (c) To encourage the mobility and full utilization of the existing work force of longshoremen;
>
> (d) To protect the job security of the existing work force of longshoremen;
>
> (e) To eliminate oppressive and evil hiring practices injurious to waterfront labor and waterborne commerce in the Port of New York District, including, but not limited to, those oppressive and evil hiring practices that may result from either a surplus or shortage of waterfront labor;
>
> (f) To consider the effect of technological change and automation and such other economic data and facts as are relevant to a proper determination.
>
> In observing the foregoing standards and before determining to suspend or accept applications for inclusion in the longshoremen's register, the commission shall consult with and consider the views of, including any statistical data or other factual information concerning the size of the longshoremen's register submitted by, carriers of freight by water, stevedores, waterfront terminal owners and operators, any labor organization representing employees registered by the commission, and any other person whose interests may be affected by the size of the longshoremen's register.

Id.

In fulfilling its responsibilities under this section, the Commission must consult with waterfront management, labor, and other interested parties. The Commission's determinations are subject to judicial review.

Pursuant to its power under § 5–p to "suspend the acceptance of applications for inclusion in the longshoremen's register for such periods of time as the Commission may from time to time establish . . . ," the Commission has opened and closed the register. Howev-

er, since 1969, the Commission has chosen not to open the register. Recently, the Commission conducted public hearings to determine if the register should be opened.

## II. *Analysis*

### A. *Subject matter jurisdiction*

■ This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. As the Supreme Court defined in *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), "[b]ecause congressional consent transforms an interstate compact within th[e Compact] Clause into a law of the United States, ... the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question." *Id.* at 438, 101 S.Ct. at 707 (citations omitted); *see also Waterfront Comm'n v. Sea Land Service, Inc.,* 764 F.2d 961, 963 n. 2 (3d Cir. 1985). For the reasons following, the Court determines that the Waterfront Commission compact, including § 5–p, is within the Compact Clause and that Congress has consented to it. Therefore, this Court has federal question jurisdiction.

### B. *Standing*

The Commission argues that CME lacks "standing" to raise any constitutional defenses on behalf of its employees or others.

■ It is certainly true that one may not claim standing to vindicate the constitutional rights of some third party. *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). However, standing is rarely raised with regard to a *defendant.* When it is, courts have generally focused on whether the defendant has a sufficient interest to present a justiciable controversy. *Natural Resources Defense Council v. Jamison,* 787 F.Supp. 231, 235 n. 1 (D.D.C.1990); Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3531 (1995). It is undisputed that a significant portion of CME's business has been and will continue to be affected by this litigation. Therefore, CME might appear to have "standing" to raise any constitutional defenses.

At the same time, the Court recognizes that if CME were to launch a declaratory action against the Commission and make the same constitutional arguments that it does here, it would clearly have to meet the applicable test for standing. And "[t]here appears to be no reason in logic not to require a defendant who seeks to litigate the lawfulness of the government's conduct in such a context to demonstrate its rights to obtain a judicial determination of its contention." *FDIC v. Main Hurdman,* 655 F.Supp. 259, 269 (E.D.Cal.1987). Because CME's posture in this case is analogous to that of a plaintiff in a typical standing dispute, the Court determines that CME must show that it has standing to raise any constitutional defenses.

■ Three elements are necessary to satisfy "the irreducible constitutional minimum of standing":

> First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to mere speculative, that the injury will be redressed by a favorable decision.

*United States v. Hays,* —— U.S. ——, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)).

■ With regard to the first, the Commission claims that CME cannot suffer injury until it obtains the relevant licenses from the Commission, tries to hire from the longshore register, and then fails to hire any employees. However, there is no doubt that, if the Commission successfully enjoined CME from pursuing its present alleged illegal activities, CME would suffer imminent economic injury. Faced with an injunction, CME would have two stark options: it could simply end these activities from which it currently earns a profit or it could acquire the required licenses and hire longshoremen from the register. In this regard, CME has presented evidence that virtually all of the longshore-

men on the register are union members, and that its employees are not. CME has also noted that unionized longshoremen receive wages greater than what it currently pays to its employees. Were the defendant to hire from the register, it would undoubtedly be forced to incur higher labor costs. In short, regardless of which option chosen, CME would have suffered an injury sufficient to confer standing. *See Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

The second constitutional element of standing—causation—requires that a plaintiff's injury be "fairly ... trace[able] to the challenged action of the defendant ..." *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136 (*quoting Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)). Here, CME's imminent economic injury stems directly from the attempt by the Commission to require it to comply with the compact.

The third constitutional element of standing mandates that CME demonstrate that its injury is likely to be redressed by a favorable decision. If CME can defeat the Commission's preliminary injunction motion with its constitutional defenses, it will not suffer economic injury. Therefore, it meets this element.

■ In addition to the above constitutional standing requirements, federal courts have also developed prudential standing considerations, which require that:

> (1) a litigant assert his [or her] own legal interests rather than those of third parties, (2) courts refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' and (3) a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based.

*Wheeler v. Travelers Ins. Co.,* 22 F.3d 534, 538 (3d Cir.1994) (citations and internal quotation marks omitted); *see also Valley Forge*

*Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

■ The first prudential element specifies that a litigant assert his own legal rights, not those of others. Here, the Commission argues that CME attempts to raise constitutional issues on behalf of otherwise qualified individuals who want to be included in the longshoremen's register. However, if the Commission's motion for an preliminary injunction were granted, CME would clearly be directly injured. This Court concludes that CME properly asserts its "own legal interests."

The second prudential element requires that the arguments of a party such as CME be more than mere "generalized grievances." The Commission contends that CME merely "addresse[s its case] to the rights of the general public." The Court disagrees. CME alleges much more than just an interest "held in common by all members of the public," *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974), and does not merely use this Court "as a forum in which to air ... generalized grievances about the conduct of government." *United States v. Richardson,* 418 U.S. 166, 175, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974) (citation omitted).

The third prudential element obliges CME to demonstrate that its interests fall arguably within the zone of interests to be protected or regulated by the constitutional provisions upon which it relies. This is self-evident.

Therefore, CME has standing to raises its constitutional defenses.

## C. *Preliminary injunction*

N.J.S.A. § 32:23–90 explicitly permits the Commission the authority to pursue an injunction in this case,

> [t]he commission may maintain a civil action against any person to compel compliance with any of the provisions of the compact, or to prevent violations, attempts or conspiracies to violate any such provisions, or interference, attempts or conspir-

acies to interfere with or impede the enforcement of any such provisions or the exercise or performance of any power or duty thereunder, either by mandamus, injunction or action or proceeding in lieu of prerogative writ.

N.J.S.A. § 32:23–90. As a threshold matter, because the Commission's actions under this provision do not come within those contemplated by N.J.S.A. § 32:23–51, which is discussed in more detail below, the Court concludes that the provision is "a federal law subject to federal rather than state construction." *See Cuyler,* 449 U.S. at 438, 101 S.Ct. at 706.

N.J.S.A. § 32:23–90 has only been interpreted only on several occasions by courts. In *Waterfront Commission v. Sea Land Service, Inc.,* 764 F.2d 961 (3d Cir.1985), the district court issued to the Commission a final injunction compelling Sea Land to register and license its crane maintenance workers. *Id.* at 967. The Third Circuit, in reviewing this injunction, suggested that § 32:23–90 merely authorized the Commission to pursue injunctive relief, rather than required the Court to grant such a remedy. It noted that the district court found the injunction warranted because Sea Land had repeatedly refused to register or license its employees. The Third Circuit concluded that this was not an abuse of discretion.

Again, in *Continental Terminals, Inc. v. Waterfront Commission,* 486 F.Supp. 1110 (S.D.N.Y.1980), the court enjoined Continental's continued operation as a stevedore until it complied with the Commission's order directing it to file for a stevedoring license. The court noted it could do this, even though there was no evidence that Continental would flout its judgment.

The statute and sparse case law suggest that, even assuming the Commission meets

the burden of proof under the statute, it is not *automatically* entitled to relief through "mandamus, injunction or action or proceeding in lieu of prerogative writ." [3] N.J.S.A. § 32:23–90. The Court sees no reason why the word "injunction" here could not refer either to a final or preliminary injunction. At the same time, though, the Court recognizes that this question deserves more searching inquiry. Two issues, then, arise. First, to what extent, if any, does the statute foreclose the exercise of this Court's usual equitable discretion. Second, what standards should the Court apply in considering the motion of the Commission for a preliminary injunction.

### 1. Equitable discretion

■ As the Supreme Court has remarked, "The starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907, 909 (3d Cir.1990). N.J.S.A. § 32:23–90 states that "the commission *may* maintain a civil action" to compel compliance with, prevent violations of, or deter interference with enforcement of the compact. N.J.S.A. § 32:23–90 (emphasis added). This language simply authorizes the Commission to sue for equitable relief. It does not *require* the Court to grant an injunction if the Commission shows, for example, that CME has violated the compact. In other words, the plain language of the statute indicates that Congress did not intend to displace the equitable standards that a court would normally apply.

---

**3.** In English law, prerogative writs were judicial writs issued by the courts only upon proper cause shown, never as a mere matter of right, the theory being that they involved a direct interference by the government with the liberty and property of the subject, and therefore were justified only as an exercise of the extraordinary power (prerogative) of the crown. In America, issuance is now generally regulated by statute, and such are generally referred to as extraordinary writs or remedies.

Black's Law Dictionary, 6th ed., at 1182. These writs include mandamus, procedendo, prohibition, quo warranto, habeas corpus, and certiorari. They were abolished in the federal courts with the adoption of the Federal Rules of Civil Procedure. Under Rule 81, the relief formerly available by such writs may now be sought by appropriate action or motion under the Rules of Civil Procedure.

■ This conclusion is borne out by an examination of the provisions that surround N.J.S.A. § 32:23–90. Where Congress intended to eliminate the discretion of the court, it made so very clear. N.J.S.A. § 32:23–88, for example, states that "[a]ny person who ... shall willfully give false testimony shall be guilty of a misdemeanor...." N.J.S.A. § 32:23–88. In addition, the compact repeatedly uses the word "shall" where Congress intends to impose mandates. As a general matter, courts should not seek to apply their equitable discretion when such discretion is explicitly precluded by the use of "shall" or similarly prescriptive legislative language. *See New Jersey Dep't of Envtl. Protection v. Briar Lake Development Corp.,* 736 F.Supp. 62, 66 (D.N.J.1990), *aff'd,* 961 F.2d 210 (3d Cir.1992) (finding that the language "the court shall enjoin such interference or direct compliance" indicated that the court had no discretion); *Government of Virgin Islands, Dep't of Conservation and Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283 (3d Cir.1983) (reversing district court for exercising equitable discretion where the relevant statute provided for preliminary injunctive relief upon a "prima facie showing of a violation"); *United States Postal Service v. Beamish,* 466 F.2d 804 (3d Cir.1972) (affirming district court's injunction where it did not use its equitable discretion in applying provision that "the United States district court ... shall ... upon a showing of probable cause to believe ... [that the relevant statutory section] is being violated, enter a temporary restraining order and preliminary injunction").

■ Also, the compact uses the same "[t]he commission may maintain a civil action ..." language in N.J.S.A. § 32:23–89. This provision enables the commission to sue "to recover a judgment for a money penalty not exceeding $500.00 for each and every offense." N.J.S.A. § 32:23–89. The provision goes on to note that "[a]ny such action may be compromised or discontinued on application of the commission upon such terms as the court may approve and a judgment may be rendered for an amount less than the amount demanded in the complaint as justice may require." Id. In other words, the statute explicitly provides for the court's discre-

tion with regard to the Commission's potential *legal* relief. Thus, it is hardly likely that Congress intended the compact to limit a court's traditional *equitable* discretion.

The Court also notes that the existence of a monetary sanction in N.J.S.A. § 32:23–89, which the Commission also seeks in this action, undercuts any argument that the Court must grant the requested equitable remedy. In *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), for example, the statute involved—the Endangered Species Act—explicitly required the district court to enjoin completion of the Tellico Dam to preserve the snail darter. As the Supreme Court noted, the purpose and language of the act limited the remedies available to the court, and *only* an injunction could vindicate the objectives of the act. Yet, here, as in *Weinberger,* an injunction is not the only means of ensuring compliance with the statute. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 314, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982). The compact provides for fines and criminal penalties. See, e.g., N.J.S.A. § 32:23–88. Consequently, there is no reason why the Court *must* grant an injunction, even if the Commission meets its burden under the statute.

If this Court had any doubt, it would nevertheless come to the same conclusion. As the Supreme Court has noted, while "Congress may intervene and guide or control the exercise of the court's discretion, ... we do not lightly assume that Congress has intended to depart from established principles" of courts' exercising equitable discretion. *Romero–Barcelo,* 456 U.S. at 310–13, 102 S.Ct. at 1802–04. Moreover,

> the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'

*Id.* at 313, 102 S.Ct. at 1804 (*quoting Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)); *accord Flynn v. United States By and Through*

*Eggers,* 786 F.2d 586, 591 (3d Cir.1986) (holding that, absent a clear Congressional statement, courts should not infer that Congress intended to alter equity practices). In sum, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances," and "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *TVA,* 437 U.S. at 193, 98 S.Ct. at 2301; *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944).

Therefore, the Court finds that Congress in consenting to N.J.S.A. § 32:23–90 did not foreclose the Court from exercising its traditional equitable discretion in this matter. The Court may choose to grant or deny an injunction depending on the weight of the equities.

### 2. *What standard to apply for preliminary injunction*

 Having determined that equitable principles should be applied to decide this motion, the Court now needs to ascertain which principles. Generally, in determining whether to grant a preliminary injunction, courts in this circuit review four factors:

(1) the likelihood that the applicant will prevail on the merits at final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992) (*citing Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197–98 (3d Cir.1990)). The applicant must meet its burden on the first two factors before the Court will consider the third and fourth elements. *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985). All four factors should favor relief before an injunction will issue. *S & R Corp.,* 968 F.2d at 374 (*citing Hoxworth,* 903 F.2d at 192).

#### a. *Irreparable harm*

 A plaintiff need not show irreparable harm where Congress has displaced the normal equitable balancing with a statu-

tory standard. *Romero–Barcelo,* 456 U.S. 305, 310–13, 102 S.Ct. 1798, 1802–04 (1982). Where the statute does not supplant the court's equitable discretion, the court will normally apply the traditional elements for a preliminary injunction. *Operating Eng'rs Cent. Pension Fund v. Joski Constr. Co.,* 441 F.Supp. 849, 850 (E.D.Wis.1977) ("Since Congress had not provided that a different standard shall apply, it is the Court's opinion that the usual standards for the granting of injunctive relief must be met."); *also see Rosa v. RTC,* 938 F.2d 383, 400 (3d Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); *Huge v. Long's Hauling Co.,* 442 F.Supp. 1041, 1043 (W.D.Pa.1977), *aff'd,* 590 F.2d 457 (3d Cir.1978), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979). In other words, "the necessity of irreparable harm in light of a statute granting courts the power to issue preliminary injunctions varies with the particular statute involved and the relief requested." *Rosa,* 938 F.2d at 400 (interpreting *Government of Virgin Islands,* 714 F.2d 283).

 The Third Circuit addressed this issue in *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.* ("*NRDC*"), 906 F.2d 934 (3d Cir.1990). There, the Natural Resources Defense Council filed a citizen suit pursuant to § 505 of the Clean Water Act. This section permits any citizen to sue any person for violations of certain effluent standards or limitations or certain government orders regarding these standards or limitations. Our Court of Appeals determined that the district court's equitable principles were not displaced by the statute. It then determined that the lower court could only issue a preliminary injunction under the statute after a showing of the traditional elements, including irreparable harm.

The Court finds that *NRDC* does not control this issue for the simple reason that the plaintiff in that case was not a statutory entity, but rather a private party. In contrast, the plaintiff here is the Waterfront Commission, an entity created by law and invested with the responsibility to fulfil the purpose of its statute by regularizing the

waterfront labor supply and thus combatting crime. The Court believes that Congress did not intend a statutory entity such as the Commission to make a showing of irreparable injury other than that injury to the public which Congress found inherent in the conduct made unlawful under the compact. *See United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *also see Rosa*, 938 F.2d at 400 ("We agree ... that to obtain monetary relief on a preliminary injunction, a *private* litigant must establish irreparable harm.") (emphasis added); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808–09 (2d Cir.1975) (since SEC suits for injunctions have "statutory sanction," the SEC need not show irreparable injury or inadequacy of other remedies; otherwise, effective enforcement of the securities law would be jeopardized). Moreover, the Court does not believe that Congress intended to mandate that the Commission demonstrate inadequacy of remedy at law. That the compact also provides for monetary and criminal sanctions will not defeat an action in equity, otherwise N.J.S.A. § 32:23–90 would be irrelevant.

If the Commission had to show irreparable harm, though, the Court finds that it could easily do so: the Commission has submitted an affidavit alleging that CME has continued to provide unlicensed stevedoring services to vessels sailing for Haiti. In other words, CME has not stopped pursuing the alleged illegal activities which are the subject of this motion. Additionally, the Commission claims that since April 1995, it has investigated about eleven other instances where companies and individuals have been engaged in apparent unlicensed stevedoring and longshoring activity similar to that in which CME is allegedly involved. If the Commission cannot quickly and decisively act against one violator, then its efforts to act promptly against others may be hindered and its statutory responsibilities unfulfilled.

In exercising its equitable discretion, the Court must assess the equities vis-a-vis the purpose of the compact. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544, 107 S.Ct. 1396, 1403–04, 94 L.Ed.2d 542 (1987). Obviously, the compact has a remedial goal. As Article I makes clear, it was passed to improve conditions on the New Jersey–New York waterfront for laborers and combat crime. The Commission, "an instrumentality of the States of New York and New Jersey," N.J.S.A. § 32:23–7, was created to implement this statutory mission. Among other things, it would manage a systematic system of hiring, provide information on the availability of employment, and help combat corrupt hiring practices. In addition, of course, it is explicitly authorized by statute to bring suit against persons to compel compliance with the compact. Because of such statutory duties, the Court finds that the Commission, when it pursues a preliminary injunction, cannot be held to the same equitable standards required for a private party. The Court concludes that the Commission need not show irreparable harm or inadequacy of legal remedies; rather, these will be presumed. Without such a determination, the effective enforcement of the compact would be threatened.

While the Commission need not show irreparable harm, it must still must meet its burden of proof of the other three elements required in this circuit for a preliminary injunction.

b. *Probability of success on the merits*

Is the Commission likely to succeed on the merits?

i. *Regulatory challenge*

At the outset, defendant CME suggests that it falls within a number of administrative exceptions to the Commission's general licensing and registration requirements. The defendant points to Commission Regulations 3.2(b)(2), 3.3, and 4.2(b)(2). In reply, the Commission argues that CME does not fit within any of these exceptions.

1) *Standard of review*

■■■ CME claims that, under the compact, it does not need a stevedore's license and that its employees do not need to be included in the longshoremen's register. The Commission has considered these arguments in administrative proceedings with CME, and rejected them. The first issue here is whether, because N.J.S.A. § 32:23–

51, CME may even challenge the Commission's decisions in this action.

N.J.S.A. § 32:23–51 provides that

[t]he action of the commission in denying any application for a license or in refusing to include any person in the longshoremen's register under this compact or in suspending or revoking such license or removing any person from the longshoremen's register or in reprimanding a licensee or registrant shall be subject to judicial review by a proceeding instituted in either State at the instance of the applicant, licensee or registrant in the manner provided by the law of such State for review of the final decision or action of administrative agencies of such State....

CME has not been an "applicant, licensee or registrant" under the statute. On the contrary, its activities and those of its employees fall outside the scope of the statute, and it has acted consistently with that argument. CME may mount its regulatory challenge as a defense to the Commission's motion for a preliminary injunction.

■ The second issue is whether a judicial review of the Commission's decisions is controlled by state or federal law. While the Commission's determinations here do not fall specifically within N.J.S.A. § 32:23–51 and, under *Cuyler,* the compact must generally be interpreted as federal law, the Court believes that it would be inappropriate to treat the Commission as a federal agency for purposes of deciding the standard of review. The Court considers that the application of state law here accords more with the intent of Congress and the purpose of the statute. Thus, the Court will rely on the law of New Jersey. It should be noted, however, that these decisions on these issues would be the same if determined under federal law.

■ Under New Jersey law, an agency's grant of authority to promulgate regulations is to be liberally construed to enable the agency to accomplish its statutory goals. *In re Solid Waste Util. Cust. Lists,* 106 N.J. 508, 516, 524 A.2d 386 (1987). A court must "accord substantial deference to the regulations adopted by administrative agencies, based on our recognition that certain sub-

jects are within the peculiar competence of that agency." *In re Amendment of N.J.A.C. 8:31B–3.31,* 119 N.J. 531, 543, 575 A.2d 481 (1990). Thus, agency regulations are accorded a presumption of reasonableness, *id.* at 544, 575 A.2d 481, and courts must not substitute their judgment for the expertise of the agency. *Dougherty v. Dep't of Human Servs.,* 91 N.J. 1, 6, 449 A.2d 1235 (1982). In addition, courts generally place considerable weight on the construction of a statute given by the agency charged with enforcing it, *Passaic Daily News v. Blair,* 63 N.J. 474, 484, 308 A.2d 649 (1973), and understand that agencies must be flexible and responsive to changing conditions in adopting regulations. *D.I.A.L., Inc. v. New Jersey Dep't of Comm. Affs.,* 254 N.J.Super. 426, 436, 603 A.2d 967 (1992); *Radiological Soc'y v. New Jersey State Dep't of Health,* 208 N.J.Super. 548, 560, 506 A.2d 755 (App.Div.), *certif. denied,* 104 N.J. 444, 517 A.2d 434 (1986).

### 2) *Regulation 3.2(b)(2)*

Regulation 3.2(b)(2) states that a

... A stevedore license shall not be required ... by any person who is not principally engaged in the movement of waterborne freight and who on occasion moves waterborne freight for or on behalf of a carrier of freight by water or a stevedore, exclusively by means of mobile land-based cranes not affixed to a pier or terminal with capacity of at least 20 tons, or exclusively by means of floating mechanical equipment....

CME concedes that it is engaged in the movement of waterborne freight, but asserts that it is not *principally* involved in such activity. It also claims that it meets the remaining requirements of the exception. In response, the Commission points to the legislative history of the provision as well as its own determination that CME is principally engaged in moving waterborne freight. The Court is persuaded that this section was not intended to exempt from regulation companies that regularly rely on mobile land-based cranes to load and unload containers. Moreover, it does not find unreasonable the Commission's conclusion that CME is principally involved in moving waterborne freight.

### 3) *Regulation 3.3*

Regulation 3.3 provides that

For the purposes of Article VI of the Act and Part 3 of these Regulations, waterborne freight shall not include freight loaded within the Port of New York District upon motor vessels not in excess of 115 foot length.

CME argues that it comes within this exception, although it gives no evidence that it has ever attempted to load freight on motor vessels less than 115 feet in length. Absent the necessary factual delineation of defendant's activity, the question whether its regulation would apply to CME is not reached.

### 4) *Regulation 4.2(b)(2)*

Under Regulation 4.2(b)(2),

... inclusion in the longshoremen's register as a longshoreman is not required for ... any person who is regularly engaged in the performance of labor or services not covered by subdivision (a) of this section and who is only incidentally engaged in the performance of labor or services covered by said subdivision (a) where permission therefor has been previously obtained from the commission ...

In turn, Regulation 4.2(a)(1) requires registration as a longshoreman of any person "who is employed to handle waterborne freight by a carrier of freight by water or by a stevedore at a pier or other waterfront terminal...." Reg. 4.2(a)(1). CME argues that its employees are only incidentally engaged in performing the labor or services covered by Regulation 4.2(a)(1). The Commission disagrees. It has determined that CME employees regularly engage in precisely such labor or services. CME does not present any plausible evidence that this conclusion is unreasonable.

In conclusion, the Court is unpersuaded that the Commission has wrongly refused to exempt CME from licensing and registration requirements. CME has failed to meet its burden of persuasion.

### ii. *Statutory challenge*

CME contends that the Commission is acting contrary to its statutory limitations. The defendant relies upon *Waterfront Commis-sion v. Sea Land Service, Inc.*, 764 F.2d 961 (3d Cir.1985). Apparently, it believes that this decision requires the Commission to make an exception to the closed register for CME and admit its employees. However, CME's belief is misplaced. Clearly, this decision—as well as every other one that has considered the issue—stands for the proposition that the Commission has the *discretion* to make exceptions to the register, pursuant to the statutory standards. This Court finds that the Commission has not abused this discretion by declining to make an exception to the closed register for CME.

CME also suggests that the Commission's actions are preempted by federal labor laws, specifically the National Labor Relations Act, 29 U.S.C. § 187. This argument also fails. As noted above, Congress approved the Waterfront Compact and has given its prior consent "to the carrying out and effectuation of said compact, and enactments in furtherance thereof." There is no preemption.

### iii. *Constitutional challenge*

Having decided CME's regulatory and statutory arguments, the Court now turns to CME's constitutional challenge. "The constitutionality of the [Waterfront Commission A]ct ... [has been] sustained many times by Federal, New York and New Jersey courts ..." *American Sugar Refining Co. v. Waterfront Comm'n,* 55 N.Y.2d 11, 19 n. 5, 447 N.Y.S.2d 685, 432 N.E.2d 578 (N.Y.1982). Here too, this Court finds that the Commission is likely to succeed on the merits.

### 1) *Compact Clause*

First, CME contends that the Commission has no authority to close the register because § 5–p violates the Compact Clause of the constitution. The Compact Clause of the Constitution reads that "No State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State ..." Art. I, § 10, cl. 3.

In this regard, the first issue is whether the Waterfront Commission Act falls under the clause as an "agreement or compact" between two or more states, thus requiring Congressional consent. In *Holmes v. Jenni-*

*son,* 39 U.S. (14 Pet.) 540, 10 L.Ed. 579 (1840), the Court adopted a rather comprehensive definition of the word "Agreement," and read the Compact Clause as "prohibit[ing]" a state from entering with another state "every agreement, written or verbal, formal or informal, positive or implied, by the mutual understanding of the parties." *Id.* at 572. Later, in *Virginia v. Tennessee,* 148 U.S. 503, 13 S.Ct. 728, 37 L.Ed. 537 (1893), the Court considerably narrowed the definition. *Id.* at 519, 13 S.Ct. at 734. It held that Congressional consent was not needed for "many matters upon which different States may agree that can in no respect concern the United States." *Id.* at 518, 13 S.Ct. at 734. Such consent, though, was needed for any agreement tending to increase the political power of the states while encroaching on the supremacy of the United States. The Waterfront Commission Act does seem to be such an agreement. Waterfront governance is closely related to interstate and foreign commerce, and unquestionably impinges on the supremacy of the federal government. *Cf. American Sugar Refining Co.,* 55 N.Y.2d 11, 447 N.Y.S.2d 685, 432 N.E.2d 578.

■ The second issue is whether Congress actually consented to the Waterfront Commission Act. The Constitution does not specify how and when Congressional consent is given to a compact. Generally, the form of consent is left to the discretion of Congress. Actual consent may be express or implied,[4] and may be given before or after the states enter into the agreement. *See Cuyler v. Adams,* 449 U.S. at 441 & n. 9, 101 S.Ct. at 708 & n. 9 (holding that Congress by enacting the Crime Control Consent Act of 1934, gave consent in advance to the Interstate Agreement on Detainers, initially drafted by the Council of State Governments in 1956); *Virginia v. Tennessee,* 148 U.S. at 521, 13 S.Ct. at 735 (noting that if the compact "relates to a matter which could not well be considered until its nature is fully developed,

it is not well perceived why the consent may not be subsequently given.").

In the leading modern decision on the Compact Clause, *United States Steel Corp. v. Multistate Tax Commission,* 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978), the Supreme Court held that the applicable test was "whether the compact enhance[d] state power *quoad* the national government." It had previously "upheld a variety of interstate agreements effected through reciprocal legislation without congressional consent," *id.* at 469, 98 S.Ct. at 811, and found that the compact under review was squarely within this tradition. The Court noted that each member state could freely adopt or reject the multistate commission's recommendations and could withdraw at any time. In addition, the commission had no powers that the member states did not retain themselves independently.

But in *Cuyler,* the Court held that the *Multistate Tax Commission* test did not apply "where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause." *Cuyler,* 449 U.S. at 440, 101 S.Ct. at 707. Because Congress had previously given general approval to all interstate crime prevention agreements and controlling crime was an appropriate subject for federal legislation, there was no violation of the Compact Clause.

Summing up the law in this area, one commentator has noted

> *Cuyler* . . . stands for the proposition that, if Congress enacts some kind of consent legislation, the Court will defer to Congress' political judgment that the compact is good for the nation and simply ignore the *Multistate Tax Commission* test. But if Congress has been silent or has actively

---

**4.** In *Virginia v. West Virginia,* 78 U.S. (11 Wall.) 39, 20 L.Ed. 67 (1870), for example, the Court held that an Act of Congress admitting West Virginia into the Union was a "clear and satisfactory" inference that Congress intended to consent to the admission of West Virginia with the same boundaries provided for in the Virginia statute that prayed for West Virginia's admission, and in doing so it necessarily consented to the agreement of those states on the subject. *Id.* at 59–60.

disapproved, the Court will then examine the challenged agreement on its own terms, in accord with the Court's own precedents, to determine whether the compact clause ... makes the absence of congressional authorization or approval fatal.

Laurence H. Tribe, American Constitutional Law 523 (2d ed. 1988).

Here, Congress clearly enacted consent legislation for the compact:

> ... the consent of Congress is hereby given to the Compact set forth below to all of its terms and provisions, and to the carrying out and effectuation of said compact, and enactments in furtherance thereof.

Pub.L. No. 83–252, 67 Stat. 541 (1953).

And the compact itself states that

> [a]mendments and supplements to the compact to implement the purposes thereof may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other.

N.J.S.A. § 32:23–70. While CME claims that Congress never implicitly approved the closing of the register, it is beyond peradventure that Congress *explicitly* approved such actions in advance. As the Supreme Court observed in *DeVeau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960),[5]

> Congress expressly gave its consent to ... implementing legislation not formally part of the [Waterfront Commission] compact. This provision in the consent by Congress to a compact is so extraordinary as to be unique in the history of compacts. Of all the instances of congressional approval of state compacts ... we have found no other in which Congress expressly gave its consent to implementing legislation. It is instructive that this unique provision has occurred in connection with approval of a compact dealing with the prevention of crime where, because of the peculiarly local nature of the problem, the inference is

strongest that local policies are not to be thwarted.

*DeVeau,* 363 U.S. 144, 154, 80 S.Ct. 1146, 1152, 4 L.Ed.2d 1109 (1960).

True, § 5–p, unlike § 8 in *DeVeau,* was adopted by the New Jersey and New York legislatures after Congress consented to the compact in August 1953. However, § 5–p merely supplements powers to which Congress consented in Article IX of the compact. *See id.* (noting that "in giving its approval to the compact Congress explicitly gave its authority to such supplementary legislation in accord with the objectives of the compact"); *New York Shipping Ass'n, Inc. v. Waterfront Commission,* Civ. No. 78–995 (D.N.J. June 1, 1978), *aff'd,* 582 F.2d 1275 (3d Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979) (holding the Commission's decision to propose the voluntary transfer of certain employees on the longshoremen's register to the checker category was "supplementary legislation" designed to carry out the mandates of the compact, and thus had been pre-consented to by Congress). Indeed, a comparison of § 5–p and Article IX reveals that much of the intent and language of the two are similar.

It is determined, therefore, that § 5–p is an "enactment[ ] in furtherance" of the compact or an "amendment [or] supplement to the compact to implement the purposes thereof": § 5–p received Congressional approval in advance.

2) *Substantive due process*

 CME now argues that closing the register violates the Due Process Clause of the Fourteenth Amendment.[6] As noted before, the Commission closed the register to help regulate the labor market on the waterfront. Such an objective falls within the police power of the states of New Jersey and New York. Such power is broadly defined to include virtually any health, safety, or general welfare goal. As long as there is a minimally rational relation between the means

---

5. *DeVeau* sustained the constitutionality of § 8 of the compact, which prohibits persons from collecting dues for waterfront unions which have officers or employees who have been convicted of certain crimes. See N.J.S.A. § 32:23–80.

6. CME mentions an alleged violation of the Equal Protection Clause as well. However, CME does not discuss this alleged violation in its brief. Because such an argument lacks foundation, it is ignored.

chosen and the end being pursued, courts must defer to the exercise of a state's police power. *E.g., Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Unless the state legislature has acted in an "arbitrary and irrational" way, there is a presumption that such regulation is constitutional. *Duke Power v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

CME urges the Court to return to the era of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), and use the doctrine of substantive due process to intercede in state economic affairs. That invitation is not accepted. This Court finds that the Commission's actions in closing the register bear a rational relationship to its goal of restricting surplus labor on the waterfront.

### 3) *Commerce clause*

Additionally, CME claims that § 5–p unduly burdens interstate commerce and therefore violates the Commerce Clause. Sometimes Congress exercises its power under the Commerce Clause to promote state interests by sanctioning state restrictions on interstate commerce which would be invalid without such congressional authorization. For instance, Congress may allow states to prohibit the transportation in their states of certain goods, even though such goods are in interstate commerce. *E.g., James Clark Distilling Co. v. Western Maryland R. Co.,* 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917). Or Congress may permit the states to impose discriminatory taxes on out-of-state corporations in interstate commerce. *E.g., Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). While Congress may not delegate to the states power to legislate in areas that are reserved to Congress, such as interstate Commerce Clause powers, it may by federal legislation, adopt and incorporate, by reference, state laws which exist or which may exist in the future.

CME's argument under the dormant Commerce Clause would only be tenable in the quiet of Congressional silence. Here, Congress has spoken. *See Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); *Wilkerson v. Rahrer,* 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1891). Thus, there is no violation of the Commerce Clause.

### c. *Possibility of irreparable harm to defendant*

To decide whether injunctive relief is appropriate, the court must determine if CME has suffered irreparable harm that would outweigh the benefits from a preliminary injunction to the Commission. *See Jiffy Lube,* 968 F.2d at 378. The Court determines that there is no evidence that CME will suffer any irreparable harm. While CME will surely pay a financial cost if prevented from unloading ships with its present methods and current employees, it is improbable that an injunction will bankrupt this defendant. The enjoined activities only represent a relatively small portion of CME's business. Moreover, any damages can be expressed in monetary terms and, if need be, compensated through an injunction bond.

Whereas, if the Commission could not obtain a preliminary injunction it might suffer much greater injury than CME. As initially noted, the Commission would be unable to execute its statutory mandate. If the Court allowed CME to carry on in a manner that, as the Court has determined, violates the compact, this will encourage similar activities; other companies and laborers could try to avoid obtaining licenses or registration. Indeed, the Commission has presented evidence that this has already happened. Apparently, since the commencement of this lawsuit, almost a dozen companies have been pursuing operations analogous to those challenged here. Such activities handicap the Commission's ability to regularize the supply of waterfront labor and thus fight crime.

### d. *The public interest*

The final element is whether a preliminary injunction would further the public interest. With this action, the Commission pursues an injunction to carry out its responsibilities under the compact. Congress and the states of New Jersey and New York have determined that the compact serves a clear public purpose: so do the Commission's actions.

■ Therefore, the Court determines that the Commission has met its burden for a preliminary injunction.

### D. *Bond*

Rule 65(c) of the Federal Rules of Civil Procedure provides that

> [n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of any officer or agency thereof.

The compact describes the Commission as "a body corporate and politic, an instrumentality of the States of New York and New Jersey." N.J.S.A. § 32:23–7. Consequently, it is clearly not an agency of the United States, automatically exempted from posting a bond.

The Third Circuit has interpreted the bond requirement very strictly. *Hoxworth,* 903 F.2d at 210. It has noted that

> [a]lthough the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may be required are so rare that the requirement is almost mandatory. We have previously held that absent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.

*Id.* at 210. An incorrect interlocutory order "may harm the defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 804 (3d Cir.1989). A bond also "deters rash applications for interlocutory orders; the bond premium and the chance of liability on it cause plaintiff to think carefully beforehand." *Id.*

■ The protection afforded by the bond requirement is important for two reasons. It is generally settled that, with rare exceptions, a defendant wrongfully enjoined has recourse only against the bond. As the Supreme Court has noted, "A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2186 n. 14, 76 L.Ed.2d 298 (1983). And since a preliminary injunction is granted before a trial on the merits, it has a higher possibility of being wrong. *Clark v. K–Mart,* 979 F.2d 965, 968 (3d Cir.1992).

■ Under certain narrowly drawn circumstances, the Court may dispense with the bond requirement. *Temple University v. White,* 941 F.2d 201, 219–20 (3d Cir.1991), *cert. denied sub. nom. Snider v. Temple University,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). The *Temple University* court relied on a two-part test. First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant. Second, a court should consider the impact that the bond requirement would have on enforcement of important federal rights or " 'public interests'," arising out of comprehensive federal health and welfare statutes. *Id.* at 219.

■ The issue, then, is whether, under the circumstances of this case, the Commission need post a bond. The scope of CME's possible loss is unclear. According to the evidence, a ship docks at CME's facility about every three weeks, and CME earns about $1000 in profits from providing stevedoring services to each ship. This amounts to some $17,000 a year. In addition, CME implies that it might also incur demurrage and other charges. It also states that it could potentially handle more than three ships a month.

Second, the Commission is not an impecunious party. By its own admission, it is "fiscally sound." Moreover, the Commission is generally funded by an annual assessment on employers of persons registered or li-

censed under the compact. N.J.S.A. § 32:23–58. This assessment is computed upon the gross payroll payments made by employers to various waterfront laborers. Every year, the Commission estimates the gross payroll payments to be made by employers subject to the assessment and computes a rate (not greater than two percent) "which will yield revenues sufficient to finance the commission's budget for each year." Id. This budget can include a reasonable amount for a reserve, as long as this is not more than ten percent of the total. As a practical matter, then, there is no reason that it cannot raise and then set aside sufficient revenues to meet the bond requirement in cases such as this.

No economic hardship or duress will be imposed upon the Commission by the requirement to post a bond. In addition, the Commission is explicitly charged with protecting the public interest by enforcing this statute.[7] In some instances, the imposition of a bond requirement on the Commission could conceivably impede its ability to fulfil that role. But that is not the circumstance here.

Based on the above analysis, the Court is unconvinced that, under the *Temple University* standard, the Commission should be exempt from the bond requirement. At the same time, it does not believe that a large bond should be required, at least in this case. Under the circumstances, a $60,000 bond will suffice.

III. *Conclusion*

The Court determines that the Commission has met its burden of persuasion for a preliminary injunction. Therefore, it **orders** that such an injunction be entered. Moreover, it **orders** the Commission to post an injunction bond in the sum of $60,000.

**SO ORDERED.**

**ORDER**

The Court has reviewed the documents filed in this case and heard oral argument from the parties. For the reasons discussed in the accompanying opinion, the Court rules as follows:

The Court **grants** the Commission's motion for a preliminary injunction.

The Court **orders** the Commission to post an injunction bond in the sum of $60,000.

**SO ORDERED.**

---

7. The Court recognizes, though, that there should be no reason, as a matter of law, why a quasi-governmental entity such as the Commission cannot be forced to post a bond. *See Maryland Dep't of Human Resources v. U.S.D.A.,* 976 F.2d 1462, 1483 (4th Cir.1992).